## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

EUGENIA WOODS,

     **Plaintiff,**

v.                         **CASE NO.  4:19-cv-00356-MW/CAS**

FLORIDA DEPARTMENT OF
HIGHWAY SAFETY AND MOTOR
VEHICLES; C. M. SWINDLE, in his
individual capacity; WALT MCNEIL,
in his official capacity as SHERIFF,
LEON COUNTY, FLORIDA, and
CORIZON HEALTH, INC.,

     **Defendants.**
_____/

## PLAINTIFF'S RESPONSE AND MEMORANDUM IN OPPOSITION TO DEFENDANT CORIZON'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, EUGENIA WOODS, through her counsel, files her Response and Memorandum in Opposition to Defendant Corizon's Motion for Summary Judgment and states the following:

## I.     PLAINTIFF'S CLAIMS AT ISSUE

On October 12, 2016, Plaintiff was traveling westbound on Interstate 10 to Tallahassee, Florida from Live Oak, Florida when FHP troopers, including Defendant Swindle, pulled Plaintiff over for allegedly driving recklessly and attempting to elude officers, although Plaintiff was in the midst of a medical crisis

at the time of the traffic stop, and had no control over her body. After Plaintiff was able to bring her vehicle to a stop, Defendant Swindle pulled her from her vehicle by her left upper arm, breaking the bone, in the process. Thereafter, Defendant Swindle and other FHP troopers threw Plaintiff to the ground and cuffed her with such force as to cause her severe pain. Once Plaintiff was booked into Leon County Jail ("LCJ"), Defendant's agents failed to provide Plaintiff with treatment for her medical crisis or for her broken arm, although nurses acknowledged that Plaintiff was disoriented and guarding her left arm, and at least one nurse stated she believed Plaintiff's left arm was broken, in violation of Plaintiff's Fourteenth Amendment rights. Plaintiff brings this action pursuant to 42 U.S.C. §1983, as well as the common law of the State of Florida.

## II.   PLAINTIFF'S STATEMENT OF DISPUTED MATERIAL FACTS

On October 12, 2016, Plaintiff was traveling westbound on Interstate 10 toward Tallahassee, Florida from Live Oak, Florida, to report for a pre-operation appointment at Tallahassee Memorial Hospital. [84-1, Pltf. Aff., ¶ 1-2; 84-3, Pltf. Dep., p. 144-145, 148-149; 85-2, Failed to Stop Report, 10/12/16]. As she traveled, Plaintiff began experiencing uncontrollable tremors throughout her body, and although she attempted to maintain control of her vehicle, she could not stop the vehicle safely. [84-1, Pltf. Aff., ¶ 3; 84-3, Pltf. Dep., p. 182-183; 85-3, Investigation Report, 10/12/16, p. 8].

During the pre-op process for knee replacement surgery, Plaintiff was instructed to cease pain medication, and had been removed from prescribed Lortab for approximately a week prior to October 12, 2016. [84-1, Pltf. Aff., ¶ 4; 84-3, Pltf. Dep., p. 154-155]. Although Plaintiff was discharged from Lortab, she continued to take Gabapentin for neuropathy she experienced because of disabilities to her spine and knees, and took the medication as prescribed prior to leaving her home on October 12, 2016. [84-1, Pltf. Aff., ¶ 5; 84-3, Pltf. Dep., p. 151-152, 157].

While Plaintiff was experiencing the uncontrolled body tremors and attempting to regain control of her vehicle, she noted that FHP troopers were attempting to pull her over, and Plaintiff brought her vehicle to a stop in the center median as soon as she was able. [84-1, Pltf. Aff., ¶ 6; 84-3, Pltf. Dep., p. 182-188].

Once Plaintiff's vehicle came to a stop, law enforcement officers approached Plaintiff's vehicle with weapons drawn, ordering her from the car. [84-1, Pltf. Aff., ¶ 7; 84-3, Pltf. Dep., p. 204-205; 86-1, Swindle's Dashcam Video, 12:34; 86-2, Cabe's Dashcam Video, 12:34]. Defendant Swindle then opened Plaintiff's driver side door, grabbed Plaintiff's upper left arm, pulled her from the vehicle and threw Plaintiff to the ground, where Defendant Swindle and other troopers restrained Plaintiff and placed handcuffs on her, injuring Plaintiff's left upper arm in the process. [84-1, Pltf. Aff., ¶ 8; 84-3, Pltf. Dep., p. 193-194; 86-1, Swindle's Dashcam Video, 12:35; 86-3, Torstrick's Dashcam Video, 12:35; 86-4, Biddle's Dashcam

Video, 12:35; 86-5, Jefferson-Shaw's Dashcam Video, 12:35].

Although Plaintiff complied with all orders by law enforcement officers, and although Plaintiff complained multiple times that her arms hurt, Plaintiff was not offered medical attention. [84-1, Pltf. Aff., ¶ 9; 84-3, Pltf. Dep., p. 202, 204-206; 86-1, Torstrick's Dashcam Video, 12:58, 13:03, 13:08-13:13; 86-2, Cabe's Dashcam Video, 12:35].

In fact, during the traffic stop, Plaintiff was so disoriented that she could not answer questions coherently and could not spell her own name, and still, no law enforcement agent offered her medical treatment. [84-1, Pltf. Aff., ¶ 10; 86-3, Torstrick's Dashcam Video, 12:45, 12:59]. Although Defendant Swindle noted that Plaintiff was experiencing eye lid and body tremors, again, no medical attention was offered to her, but rather, law enforcement agents simply assumed that Plaintiff was under the influence of a substance and charged her with a DUI. [84-1, Pltf. Aff., ¶ 11; 85-3, Investigation Report, 10/12/16, p. 8].

After being cuffed, Plaintiff was hoisted by her arms, including her injured left arm, and dragged across the highway to the emergency lane where she was expected to perform field sobriety exercises. [84-1, Pltf. Aff., ¶ 12; 84-3, Pltf. Dep., p. 212-214; 86-5, Jefferson-Shaw's Dashcam Video, 12:46; 86-1, Swindle's Dashcam Video, 12:36, 12:47].

After failing field sobriety exercises, Plaintiff was charged with DUI and

eluding officers with lights and sirens. [85-2, Failed to Stop Report, 10/12/16; 85-3, Investigation Report, 10/12/16].

Plaintiff was then transported to Leon County Jail ("LCJ"), where she was booked on the charges described by Defendant Swindle. [84-1, Pltf. Aff., ¶ 14; 85-2, Failed to Stop Report, 10/12/16; 85-3, Investigation Report, 10/12/16].

During the booking process, Plaintiff was guarding her left arm, and complained about her left upper arm hurting, but no one offered Plaintiff medical attention for her left arm. [84-1, Pltf. Aff., ¶ 15; 86-6, Medical Records, p. 7]. Although Plaintiff was noted as being disoriented, again, no medical attention was offered to her, but instead, medical employees noted that she was under the influence of a substance, and placed her under watch for withdrawal symptoms. [84-1, Pltf. Aff., ¶ 16; 84-2, Pltf. Dep., p. 44-45; 86-6, Medical Records, p. 7].

Defendant Corizon had a practice of allowing nurses to place inmates on withdrawal protocols without actual orders from a practitioner. [86-6, Medical Records, p. 20]. No agent for Defendant Corizon indicated whether the orders were verbal or via telephone or whom the practitioner was that ordered Plaintiff be placed on withdrawal protocols, although Plaintiff had no evidence of a substance in her system. [86-6, Medical Records, p. 20]. Defendant Corizon did not always have a doctor on site, and relied on nurses to determine whether inmates required additional treatment by speaking with doctors by telephone without the doctors physically

examining the inmates and/or sending inmates out to hospitals when doctors were not present. [86-7, C. Stephens' Dep., p. 21-23]. Nurses do not diagnose conditions, but rather, document their assessments of inmates. [86-7, C. Stephens' Dep., p. 22].

During the booking process, Plaintiff was required to complete a breathalyzer test which returned a 0.000, and Plaintiff provided a urine sample which also indicated that there were no substances in her body. [84-1, Pltf. Aff., ¶ 17; 84-2, Pltf. Dep., p. 69-71; 86-8, Swindle's Dep., p. 14-15].

After Plaintiff was booked into LCJ and placed on the substance withdrawal protocol, Plaintiff was seen by medical employees multiple times each day, but those medical employees simply evaluated any withdrawal symptoms Plaintiff suffered and did not evaluate Plaintiff's arm injury. [84-1, Pltf. Aff., ¶ 18; 86-7, C. Stephens' Dep., p. 46-47; 86-6, Medical Records, p. 21-26]. Therefore, on October 13, 2016, Plaintiff submitted a Health Services Request Form for treatment of injuries she suffered during her arrest, including bruising on her arms, knees and left arm/wrist pain. [84-1, Pltf. Aff., ¶ 19; 86-6, Medical Records, p. 17]. Plaintiff submitted the form to the nurse passing out medications to inmates, and the nurse examined her arm, noting that Plaintiff's left shoulder/upper arm was bruised and swollen, but still, Plaintiff was not provided treatment for the injury. [84-1, Pltf. Aff., ¶ 20; 84-2, Pltf. Dep., p. 52; 86-6, Medical Records, p. 17]. In fact, Plaintiff heard the nurse tell another medical employee that she believed Plaintiff's left arm was broken. [84-1,

Pltf. Aff., ¶ 21; 85-1, Pltf. Dep., p. 292-294].

While in LCJ custody, Plaintiff was not able to reach her husband until October 14, 2016, after LCJ personnel resolved an issue with her telephone PIN, at which time, Plaintiff told her husband of her location and that she believed her arm was broken. [84-1, Pltf. Aff., ¶ 22; 86-9, Woods' Dep., p. 26; 86-10, Note from Prisoner].

Plaintiff's husband posted her bond on October 15, 2016, and Plaintiff was released from LCJ on October 15, 2016 without ever receiving medical treatment for her arm injury. [84-1, Pltf. Aff., ¶ 23; 86-11, F. Stephens' Dep., p. 33, 41].

On October 16, 2016, Plaintiff was diagnosed with a fractured left humerus. [84-1, Pltf. Aff., ¶ 24; 84-2, Pltf. Dep., p. 54-55; 86-12, Shands Live Oak Medical Records].

### III.  **STANDARD FOR SUMMARY JUDGMENT**

"Summary judgment is such a lethal weapon, depriving a litigant of a trial on the issue, caution must be used to ensure only those cases devoid of any need for factual determinations are disposed of by summary judgment." Tippens v. Celotex, 805 F.2d 949, 952-53 (11th Cir. 1986).  Summary judgment is proper only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(a). Genuine issues of fact are those where the evidence is such that a reasonable jury could return a verdict

for the non-movant. See Anderson v. Liberty Lobby, 477 U.S. 242, 250 (1986). In

deciding whether a genuine issue of material fact exists, the Court must accept the

truth of Plaintiff's allegations and evidence and "must draw all reasonable inferences

in Plaintiff's favor." Cottrell v. Caldwell, 85 F.3d 1480, 1486 n.3 (11th Cir. 1996). In

ruling on a motion for summary judgment, the court "may not weigh conflicting

evidence or make credibility determination of our own.  If the record presents

disputed issues of fact, the court may not decide them; rather, [it] must deny the

motion and proceed to trial." Jones v. UPS Ground Freight, 683 F.3d 1283, 1292

(11th Cir. 2012)(citations omitted).

In order to withstand a summary judgment motion, the non-moving party must

establish that based on the evidence in the record there can be more than one

reasonable conclusion as to the proper verdict.  See Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 250 (1986).

As the Eleventh Circuit has explained the standard:

In assessing whether the movant has met this burden, the courts should
view the evidence and all factual inferences therefrom in the light most
favorable to the party opposing the motion.  If the record presents
factual issues, the court must not decide them; it must deny the motion
and proceed to trial.  Summary judgment may be inappropriate even
where the parties agree on the basic facts, but disagree about the
inferences that should be drawn from these facts.  If reasonable minds
might differ on the inferences arising from the undisputed facts, then
the court should deny summary judgment.

Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir. 1999)(quoting Clemons

v. Dougherty County, 684 F.2d 1365, 1368-69 (11th Cir. 1982)(citations omitted).

## IV.  **DEFENDANT'S FOURTEENTH AMENDMENT VIOLATION**

Plaintiff claims Defendant violated her Constitutional rights under the Fourteenth Amendment by failing to administer required medical care after her incarceration.[1] To prove government liability in a Fourteenth Amendment right to medical care case, there is no subjective component, and the Plaintiff need only show an objective risk of injury. City of Canton v. Harris, 489 U.S. 378 (1989). "Unlike the deliberate indifference standards used to determine [officer liability] this standard [for municipal liability] does not contain a subjective component."[2] Gibson v. County of Washoe, 290 F. 3d 1175, 1195 (9th Cir. 2002); see also Farmer v.

---

[1] The Eighth Amendment's Cruel and Unusual Punishment Clause encompasses the treatment of a convicted inmate, see Estelle v. Gamble, 429 U.S. 97, 104 (1976), while the Fourteenth Amendment's Due Process Clause governs a pre-trial detainee. See Bell v. Wolfish, 441 U.S. 520, 535 n. 16 (1979).  Courts utilize the same standard for deliberate indifference under either Amendment.  See Hamm v. DeKalb County, 774 F.2d 1567, 1573-73 (11th Cir. 1985).

[2] The deliberate indifference standard for individuals is the same standard to be applied to a county on the Plaintiff's denial of medical care and the failure to protect/train claims. The standard is, however, applied differently to governmental entities in two significant ways. First, the causation standard for governmental entities is articulated differently. Second, as applied to an individual, Farmer instructs that the deliberate indifference standard is a subjective standard requiring actual knowledge of a risk by the official. In the governmental liability context, deliberate indifference is an objective standard which is satisfied if the risk is so obvious that the governmental entity should have known of it. Barney v. Pulsipher, 143 F. 3d 1299, 1308 n. 5 (10th Cir. 1998); Farmer, 511 U.S. at 840-42 (discussing Canton).

Brennan, 511 U.S. 825, 841 (1994)(distinguishing Canton's objective standard from the subjective standard applicable in individual liability cases).

To satisfy the objective component, an inmate must show from objective facts that she is "incarcerated under conditions posing a substantial risk of serious harm." Farmer, 511 U.S. at 834. A serious medical need may include one that requires preemptive care in order to protect an inmate against a future risk. See Helling v. McKinney, 509 U.S. 25, 32-33 (1993). Deliberate indifference rests "somewhere between the poles of negligence at the one end and purpose or knowledge at the other." Farmer, 511 U.S. at 836. But deliberate indifference "does not require a finding of express intent to harm." Mitchell v. Maynard, 80 F. 3d 1433, 1443 (10th Cir. 1996). Significantly, this level of intent can be proven through circumstantial evidence:

> "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."

Farmer, 511 U.S. at 843. "[A]n official acts with deliberate indifference when he knows that an inmate is in serious need of medical care, but he fails or refuses to obtain medical treatment for the inmate." Lancaster v. Monroe County, 116 F.3d 1419, 1425 (11th Cir. 1997). Further, even delay in medical treatment constitutes deliberate indifference when an arrestee presents an emergent or life-threatening

medical condition.  See Hill v. Dekalb Reg'l Youth Detention Ctr., 40 F.3d 1176, 1187 (11th Cir. 1994). Farmer holds that an Eighth Amendment inmate need only show that the risk of injury was obvious and does not need to show that the defendant wanted the inmate to be injured by the dangerous condition. "[A] prison official [may not] escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant" was likely to become a victim. Farmer, 511 U.S. at 843.

In the present case, Defendant's agents, medical employees at LCJ, acknowledged that Plaintiff was obviously disoriented and guarding her left arm at the time that she was booked into the jail, and yet, the only treatment they provided was to monitor Plaintiff's vital signs. Moreover, although Plaintiff requested medical attention through a Sick Call Request form, her request was ignored, but medical employees noted that Plaintiff's left upper arm was bruised and swollen and at least one nurse said that she believed Plaintiff's left arm was broken within Plaintiff's presence.

It does not take a trained medical professional to realize that someone who has a broken arm is experiencing pain and has an immediate need for medical attention. Moreover, a person who cannot even spell her name, although all tests show that she is not inebriated, requires some form of attention beyond having her

vital signs monitored. Defendant failed to provide needed medical treatment thereby violating Plaintiff's civil rights.

"An inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of [the] delay in medical treatment." Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1188 (11th Cir. 1994). Expert testimony is certainly not necessary for cases in which the medical need is so obvious that a layperson would recognize the need for treatment.  See Johnson v. Kats-Kagan, 2007 WL 2176004, at *5 (N.D. Fla. 2007).  Without a doubt, any person would understand that a person with a broken arm and with mental disorientation so severe as to be unable to answer simple questions or to even spell her own name is in desperate need for medical intervention.

Because factual issues remain, in this case, summary judgment should be denied.

## V. **DEFENDANT LIABLE FOR AGENTS' ACTIONS**

### A. **§1983 LIABILITY**

The Defendant is liable under §1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury . . .." Monell v. Department of Social Services, 436 U.S. 658, 694, 98 S. Ct. 2018, 2037-38, 56 L.

Ed. 2d 611 (1978). Only deprivations undertaken pursuant to governmental "custom" or "policy" may lead to the imposition of governmental liability.

Defendant is liable under §1983 if Plaintiff establishes that Plaintiff's inadequate medical care and injuries were the result of: (1) Defendant's policies or customs or (2) Defendant's final policymaker(s) acted with deliberate indifference to a constitutional deprivation, or (3) Defendant's final policymaker(s) delegated authority to a subordinate who, in turn, caused a constitutional deprivation, or (4) Defendant's final policymakers ratified a constitutionally impermissible decision or recommendation of a subordinate employee. Sherrod v. Palm Beach County School District, 424 F.Supp.2d 1341, 1344 (S.D. Fla. 2006).

Defendant had a policy of allowing nurses to place inmates on withdrawal protocols without having the inmates seen by doctors, and allowed nurses to delay in seeing inmates for more than 48 hours from the time that an inmate submitted a sick call request. In this case, although a nurse acknowledged the damage to Plaintiff's arm and questioned whether the arm was broken, the nurse did not rush Plaintiff's sick call request, did not provide emergency treatment, and allowed Plaintiff to remain in general population with no treatment for the remainder of her time at LCJ. In addition, although the form requires that a doctor place an inmate on withdrawal protocols, Defendant's agents withdrew the requirement as standard protocol. Plaintiff entered the jail so disoriented she could not follow simple

13

commands, could not answer simple questions and could not spell her own name for officials. A breathalyzer showed Plaintiff was not drunk. A urinalysis showed she was not under the influence of any narcotic. Yet, nurses placed Plaintiff on withdrawal protocols and never had her seen by a doctor to evaluate the disorientation.

At the time of Plaintiff's incarceration, Defendant did not have onsite twenty-four hour doctor care.

The problem with Defendant's policies are that in practice these can lead to the deliberate indifference of an inmate's medical needs based on the fact that there were no doctors present at the time that Plaintiff was booked into the jail, and therefore, the acquisition of important health information can be delayed for hours, and it delegated the authority to individual nurses or Cos to make health related calls when doctors were not present. In this case, Plaintiff complained that her arm hurt, and while a nurse acknowledged it was broken, and noted that it was bruised and swollen, still, no treatment was provided to Plaintiff for her arm, and she was n ever evaluated by a doctor. In addition, when Plaintiff was booked into the jail, no one bothered to evaluate her disorientation, assuming it was caused by substances which were not present in her body. Instead, Plaintiff was placed on withdrawal protocols and had her vital signs monitored, but never received evaluation or treatment for whatever caused the disorientation.

Ignoring Plaintiff's complaints of inadequate medical care and depriving an inmate of necessary treatment, is obvious deliberate indifference. See Goebert v Lee County, 510 F.3d 1312, 1328 (11th Cir. 2007) (sheriff office captain disbelieving inmate's complaints of inadequate medical care "smacks of deliberate indifference").

Plaintiff need not prove widespread abuse to hold the Defendant liable for its unconstitutional custom or policy. Even a "single incident of unconstitutional activity" may be sufficient to hold Defendant liable. City of Oklahoma City v. Tuttle, 471 U.S. 808, 823-24, 105 S.Ct. 2427, 85 L.Ed.2d. 791 (1985). Additionally, any novelty regarding Plaintiff's claim as to Defendant is no excuse for its inadequate custom or policy. See Trezevant v. City of Tampa, 741 F.2d 336, 340 (11th Cir. 1984). Defendant's repeated failure to administer to Plaintiff any form of competent medical examination and/or treatment is sufficient enough for a jury to find that Defendant had a practice that resulted in Plaintiff's injury. See McMillan v. Hunter, 2007 WL 570180, at *5 (M.D. Fla. 2007) (genuine issues of fact remain where jail failed to provide Plaintiff with at least thirty-nine doses of HIV medication).

 "One method of attributing conduct to the municipality is for plaintiff to show that the policy maker was aware of the subordinates' unconstitutional actions and consciously chose to ignore them." Amnesty Am. v. Town of West Hartford, 361 F.3d 113, 126 (2d Cir. 2005) (citing Sorlucco v. New York City Police Dep't., 971

F.2d 864, 870-71 (2d Cir. 1992)(stating that municipal liability lies where the subordinate's misconduct is "so manifest as to imply the constructive acquiescence of senior policy-making officials"). Where a policy-making official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a "deliberate choice," that acquiescence may "be properly thought of as a city 'policy or custom' that is actionable under §1983." City of Canton, Ohio v. Harris, 489 U.S. 378, 388, 109 S.Ct.1197, 103 L.Ed.2d 412 (1989); see also Vann v. City of New York, 72 F.3d 1040, 1049 (2d Cir. 1995), Jeffes v. Barnes, 208 F.3d 49, 63 (2d Cir. 2000)(holding that sheriff's acquiescence in unconstitutional retaliation could be inferred from his tolerance of harassment of plaintiffs).

The Eleventh Circuit has explicitly recognized and approved the ratification method of proving official capacity claims under §1983 in Mandel v. Doe, 888 F. 2d 783 (11th Cir. 1989). In Mandel, the defendant argued that the plaintiff failed to prove a custom or policy by showing a pattern of unconstitutional acts. Id. at 791. The Court in Mandel rejected the defendant's argument by pointing out that the plaintiff had proceeded on an altogether different method of proving custom or policy: "the delegation of final policymaking authority from one official to another and the ratification of a subordinate's actions by a final policymaker." Id. (citing City of Oklahoma v. Tuttle, 471 U.S. 808, 834, 105 S.Ct. 2427, 2441, 85 L.Ed.2d 791

(1985)(Brennan, J., concurring in part and concurring in the judgment)("there may be many ways of proving the existence of a municipal policy or custom that can cause a deprivation of a constitutional right."). The court in <u>Mandel</u> also discussed a number of Supreme Court cases in which alternative theories were addressed holding local governments liable under § 1983 for a single decision by a government policymaker.

For example, in <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), the court upheld a finding of municipal liability based on a single decision by a municipal policymaker. And in <u>City of St. Louis v. Praprotnik</u>, 485 U.S. 112, 108 S. Ct. 915, 99 L.Ed.2d 107 (1988), in an effort to clarify when a decision on a single occasion may be enough to establish an unconstitutional municipal policy, the Court reasoned that "[i]f the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality . . .".

Based on <u>Praprotnik</u> and <u>Pembaur</u>, "municipal liability may attach to a single decision made by a municipal official if that municipal official is the final policymaker for the municipality with respect to the subject matter in question." <u>Mandel</u>, 888 F.2d at 793. In <u>Mandel</u>, the court found that a physician's assistant was the final policymaker for the defendant with respect to the medical affairs of a road prison. <u>Id.</u> at 794. Because he had been delegated this final policymaking authority,

his acts of deliberate indifference could be attributed to the defendant so as to establish municipal liability. Id. Liability was found in Mandel even though there was only one incident to support the existence of a governmental policy or custom **because** of the delegation of final policymaking authority from one official to another and the ratification of a subordinate's action by a final policymaker. Id. at 791.

In this matter, the Defendant delegated authority over the medical department of the jail to employees, including nurses who were given authority to place inmates on withdrawal protocols with no input from doctors. The nurses then ignored Plaintiff's physical and mental symptoms and requests for medical treatment. Defendant's agents' inaction leading to Plaintiff's deprivation of medical care can be attributed to the Defendant.

A combination of ineffective policies, insufficient customs and practices, together with the delegation of authority and ratification of the same all led to Plaintiff being denied medical treatment for the entirety of her incarceration at the jail, thereby violating her constitutional rights.

## VI.   <u>NEGLIGENCE</u>

Defendant Corizon argues that Plaintiff's negligence count is one for medical malpractice, and that Plaintiff did not file the necessary pre-suit notice. Therefore, Defendant Corizon states that Plaintiff's negligence count against it must be

dismissed. However, Defendants violated Plaintiff's civil rights by denying her medical treatment.

"Corrections officers have a duty to use reasonable care to insure the safety of inmates during their incarceration" and this includes a "duty to render medical treatment." Slone v. Judd, 2011 WL 1124618 at *21 (M.D. Fla. March 25, 2011) (quoting Ferguson v. Perry, 593 So.2d 273, 277 (Fla. 5th DCA 1992)). Failing to abide by this duty is an operational activity that does not protect Defendant from liability. See id. The reasonable care standard requires the officers to provide first aid within their abilities or to obtain medical treatment for the inmate. See id. (citing Nobles v. Corrections Corp. of Am., 327 Fed. Appx. 838, 840 (11th Cir. 2009). All the failure to render medical treatment to Plaintiff, including a refusal to provide evaluation and treatment for Plaintiff's broken arm and mental disorientation, information obvious to Defendants, constitute negligence on the part of Defendant Corizon as it is vicariously liable for the inactions of its staff. This is not medical malpractice, but general negligence of its duties. Whether the correctional officers and medical staff were negligent in not seeking medical treatment for Plaintiff is a jury question. See id.

## VII.   NEGLIGENT TRAINING AND SUPERVISION

The elements for a claim of negligent supervision in the State of Florida are: "(1) the existence of a relationship giving rise to a legal duty to supervise; (2)

negligent breach of that duty; and (3) proximate causation by virtue of that breach." Vaden v. Campbell, 2009 WL 1919474 at *2 (N.D. Fla. July 2, 2009). Negligent supervision occurs "when, during the course of employment, the employer becomes aware or should have become aware of problems with an employee that indicated his unfitness, and the employer fails to take further action such as investigating, discharge, or reassignment." Garcia v. Duffy, 492 So.2d 435, 438-39 (Fla. 2nd DCA 1986); see also, Grapski v. Barcia, 2011 WL 3477041 at *16 (N.D. Fla. Aug. 9, 2011). As to the Plaintiff's negligent training claim, she must show that she was harmed as a result of Defendant Corizon's failure to adequately train employees, and that the nature of the employment put the plaintiff in a "zone of risk" such that the Defendant had a duty running to the Plaintiff. Adler v. Westjet Airlines, Ltd., 31 F. Supp. 3d 1381, 1388 (S.D. Fla. 2014)(internal citations omitted).

Plaintiff maintains that Defendant Corizon's duties under these claims were operational in nature, not discretionary planning functions. The discretionary-function exception only applies when "the governmental act in question involved an exercise of executive or legislative power such that, for the court to intervene by way of tort law, it inappropriately would entangle itself in fundamental questions of policy and planning." Kaisner v. Kolb, 543 So.2d 732, 737 (Fla. 1989); see also, Seguine v. City of Miami, 627 So.2d 14, 17 (Fla. 3d DCA 1993)("governmental acts which attempt to implement policy at the operational level do not fall within this

discretionary act exception").

In this case, Plaintiff complained multiple times about the treatment she received at the hands of Defendant's agents and begged for help from Defendant's agents, and yet, Defendant's agents failed to provide that help.

Plaintiff maintains that there were signs that individual agents of Defendant were not acting in a manner consistent with a medical employee fit for duty prior to Plaintiff's arrest and abuse, yet Defendant's negligent training and supervision permitted them to remain on patrol. This negligent supervision led to Plaintiff's harm and subsequent damages for which Defendant is liable. Summary judgment should be denied on these counts.

## VIII. <u>CONCLUSION</u>

Summary judgment should be denied on all claims, for the reasons stated herein.

Respectfully submitted,

<u>/s/  Marie A. Mattox</u>
Marie A. Mattox [FBN 0739685]
MARIE A. MATTOX, P.A.
203 North Gadsden Street
Tallahassee, Florida 32301
(850) 383-4800 (telephone)
(850) 383-4801 (facsimile)

ATTORNEYS FOR PLAINTIFF

21

## **CERTIFICATE OF COMPLIANCE**

I hereby certify in accordance with Local Rule 7.1(F) that this response complies with the format requirements specified in Local Rule 5.1(C) and contains 5024 words.

/s/  Marie A. Mattox
Marie A. Mattox

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by CM/ECF to all counsel of record this 21st day of September, 2020.

/s/  Marie A. Mattox
Marie A. Mattox